IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 23, 2022

**STATE OF TENNESSEE v. MICHAEL JAMES ELROD**

**Appeal from the Criminal Court for McMinn County**
**No. 16-CR-303      Sandra Donaghy, Judge**
_____

**No. E2021-00622-CCA-R3-CD**
_____

Michael James Elrod, Defendant, was indicted by the McMinn County Grand Jury for second degree murder and aggravated assault after attacking his parents with a hunting knife. Following a jury trial, Defendant was convicted as charged. The trial court sentenced Defendant to 20 years for second degree murder. The trial court sentenced Defendant to three years, suspended to probation, for aggravated assault. The sentences were ordered to be served consecutively. Defendant maintains on appeal (1) that the evidence was insufficient to support his convictions based on his insanity and diminished capacity defenses; and (2) that the trial court abused its discretion in imposing consecutive sentencing. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Sheridan C. F. Randolph (at the motion for new trial and on appeal), Cleveland, Tennessee; Wencke West (at trial), Cleveland, Tennessee, Andrew Bateman (at trial), Athens, Tennessee, and Matthew Rogers (at trial), Athens, Tennessee for the appellant, Michael James Elrod.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Matthew Dunn and Emily Petro, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Defendant was indicted by the McMinn County Grand Jury for second degree murder and aggravated assault after killing his father, Phillip Elrod, and seriously injuring his mother, Teresa Elrod, with a hunting knife. A four-day jury trial was held in October of 2018. The following facts were established at trial:

Teresa Elrod, Defendant's mother, testified that on the morning of June 26, 2016, her husband and Defendant's father, Phillip Elrod, was in the kitchen after fixing breakfast for his family. Mrs. Elrod and her eight-year-old granddaughter, O.E.,[1] were sitting in the living room with their backs to the kitchen. Defendant brought Mrs. Elrod her food and asked O.E. if she wanted him to prepare her cereal. Defendant walked back into the kitchen. A moment later, Mrs. Elrod heard her husband say, "what the hell [Defendant]?" Mrs. Elrod turned around and looked into the kitchen. She saw Defendant with a hunting knife "in the motion to stab [Mr. Elrod]." Mrs. Elrod screamed Defendant's name, but he did not respond. She went into the kitchen and again yelled Defendant's name. O.E. entered the kitchen sometime after her grandmother. Defendant continued stabbing Mr. Elrod. After Mrs. Elrod shouted Defendant's name "a couple more times," Defendant turned around and faced her. Defendant and Mrs. Elrod struggled over the knife, and Defendant eventually stabbed Mrs. Elrod under her left armpit. Defendant proceeded to wipe the blood off of the knife with a t-shirt. Defendant left the knife in the kitchen.

The State presented a video recording of an interview with O.E. that occurred at a child advocacy center. O.E. recalled her grandmother asking Defendant why he stabbed them and Defendant saying, "how does it feel to be stabbed in the back?" While Mrs. Elrod initially testified that she did not recall the statement, she later admitted that she most likely heard Defendant make the statement.

After Defendant stabbed Mrs. Elrod, Mrs. Elrod told O.E. to run. O.E. went into a bedroom. Defendant searched for O.E. He entered the bedroom where she was hiding and picked her up. Mr. and Mrs. Elrod followed Defendant out of the kitchen and into the hallway, pleading with him to put her down. Defendant carried her outside the house. Defendant told O.E. he was not going to hurt her and that she needed to run away.

Mrs. Elrod called 911 and told the operator her granddaughter was in danger. Mrs. Elrod hung up the phone. A 911 operator called back to Mrs. Elrod's cellphone. Defendant answered the phone and handed it to Mrs. Elrod. Defendant went back inside the house. Mrs. Elrod told the operator that Defendant was "crazy or something." Mrs. Elrod testified that she thought Defendant was delusional and that he did not know who he was attacking.

---

[1] It is the policy of this Court to protect the identity of minor victims.

The Englewood Police Department ("EPD") dispatched officers Charles Gotsey and Jeremy Harrison to Defendant's residence for "a domestic with a knife involved." When Officer Gotsey arrived, Defendant walked out of the house towards him. Officer Gotsey testified Defendant said, "I stabbed the M.F.er's because they're pedophiles and they're hurting that little girl in there." Officer Gotsey ordered Defendant to put his hands in the air, and Defendant complied. Officer Gotsey asked Defendant for his name and the location of the knife. Defendant told Officer Gotsey the knife was in the kitchen. In response to whether Defendant stabbed his parents, Defendant said he did not know the people in the house. Defendant said that the people in his house were trying to hurt his niece. Defendant appeared to understand that Officer Gotsey was a police officer and followed his instructions. Officer Gotsey detained Defendant in the back of his police car. Officer Gotsey said that in his opinion, Defendant really believed that the people inside the house were not his mother and father.

Officer Harrison testified that when he arrived, Defendant was already secured in the back of Officer Gotsey's police car. Officer Harrison spoke with Mr. and Mrs. Elrod outside the residence at their pickup truck and called emergency medical services ("EMS"). Officer Harrison waited outside with Mr. and Mrs. Elrod until EMS arrived and then walked into the residence with Mrs. Elrod to locate the knife. Officer Harrison testified that he met Defendant several times prior to the stabbing. During those interactions, Defendant never exhibited paranoid or delusional behaviors.

When emergency medical responders arrived, they prepared Mr. Elrod for immediate transport. Mr. Elrod quickly became unresponsive and died on his way to the hospital. The trial court accepted Dr. Amy Hawes as an expert in forensic pathology. Dr. Hawes performed an autopsy of Mr. Elrod. She testified that Mr. Elrod suffered five stab wounds and died as a result of his injuries.

Officer Gotsey drove Defendant to the EPD. EPD Police Chief Gary Miller interviewed Defendant. Chief Miller described Defendant as "calm, very polite[.]" Chief Miller testified that he told Defendant his father had passed away, and Defendant said he did not want to talk about it. Chief Miller recalled that after he told Defendant his father had died, Defendant did not have any sort of emotional reaction.

TBI Special Agent Keith Herron testified that on the day of the stabbing, he obtained a search warrant for a draw of Defendant's blood. Hospital personnel at Starr Regional Medical Center conducted the draw. Special Agent Herron sent the blood sample to the TBI Forensic Laboratory in Nashville. Special Agent Herron testified that the toxicology reports for alcohol and drugs were both negative. The drug toxicology report tested for "barbiturates, benzidines, cannabinoids, cocaine, and opiates."

Defendant moved for a judgment of acquittal at the close of the State's proof. Defendant argued that he established the defense of insanity by clear and convincing evidence through cross-examination of the State's witnesses and that the State failed to rebut the defense. The State argued that Defendant had not presented evidence of insanity within the legal definition of the word and that it would rebut the insanity defense after the defense rested its case. The trial court denied Defendant's motion.

Defendant offered Chadwick Simpson, Charity Elrod, and Dr. Stephen Montgomery as witnesses. Mr. Simpson testified that he had lived in the same neighborhood as the Elrod family, gone to school with Defendant, and known Defendant practically his whole life. Mr. Simpson recalled that Defendant exhibited strange behavior and acted bizarre in the weeks leading up to the stabbing. Mr. Simpson recalled Defendant believing that his "tribal" tattoo represented a "f*g." Mr. Simpson testified Defendant told him that Defendant's employers were setting him up to "manipulate him into doing things that he shouldn't be doing[.]" Two days prior to the stabbing, Mr. Simpson saw Defendant wearing a hooded sweatshirt on a walk. He said he thought this was strange because it was the middle of June.

Charity Elrod, Defendant's older sister, testified that in the weeks leading up to the attack, she also witnessed abnormal behaviors from Defendant. One week before the stabbing, Defendant and his father visited Ms. Elrod to change the tire on her car. Ms. Elrod testified that Defendant would not socialize with her and was talking to himself. She invited Defendant to see her new pool. Defendant "star[]ed at the pool . . . look[ed] up at the sky, started mumbling, was walking around in circles in the yard, and then he went back to the truck." Ms. Elrod acknowledged that this behavior was not really out of character for Defendant and she could recall "lots of instances of [Defendant] doing that."

Ms. Elrod testified that weeks prior to the pool incident, Defendant called her and asked to use her internet early one morning. He came over to her house and used her computer to make "another Facebook profile." Ms. Elrod paraphrased Defendant's words, "I have to do this because I'm gonna be an informant for the Police Department. . . . I'm doing this to protect you, daddy, momma, and [O.E.]" When asked whether she thought Defendant could appreciate reality from unreality, she said, "[s]ometimes he did, and sometimes he didn't."

Defendant presented Dr. Stephen Montgomery and the trial court accepted him as an expert in the field of psychiatry. Prior to interviewing Defendant, Dr. Montgomery reviewed Defendant's records, police reports, witness statements, and places of prior treatment. Dr. Montgomery testified that a 2012 record from a mental health center showed that Defendant had been using cocaine, experiencing psychosis, and that he was

prescribed antipsychotic medication. Dr. Montgomery explained psychosis as "a loss of contact with reality. So either the person is believing something to be true, and it's not true. . . . Or they could be hallucinating. They're hearing things, there's not really anybody making noise."

Dr. Montgomery interviewed Defendant for three hours on February 17, 2017. During the interview, Defendant shared that his history with drugs and alcohol began at approximately 13 years of age. Defendant said that in his early twenties, he began using cocaine and methamphetamine. Defendant told Dr. Montgomery he also abused anxiety prescription medication and pain medicines.

Dr. Montgomery conducted a screening test called the MFAS. The MFAS is intended to help determine whether an individual is feigning mental illness. The test considers 25 separate items and if an individual scores six or higher on the test, the test is positive for exaggeration of mental illness. Defendant scored 10 out of 25 on the test. Dr. Montgomery then gave Defendant the SIRS-2 test.[2] He explained that the SIRS-2 test measures eight scales to determine whether an individual is malingering. Defendant scored probable for malingering on two scales, indeterminate on four scales, and not malingering on two scales. According to Dr. Montgomery, the SIRS-2 test results were "indeterminate."

Dr. Montgomery testified, however, that he would not base a malingering diagnosis solely on one positive test result. He explained, "it would be based on when I interview the person, are they telling me symptoms of mental illness that fit with the way I know that mental health -- mental symptoms really work from when I see patients[.]" Defendant told Dr. Montgomery that he "was having bad dreams[,] nightmares[,] some suicidal thoughts . . . panic attacks, shortness of breath, shaking, heart racing[,] . . . [and] hallucinations." Dr. Montgomery recalled Defendant saying he once heard people in the attic, thought people were talking about him, and "thought the television was sending him messages[.]"

Dr. Montgomery said Defendant told him he felt remorse for his actions. He described that as a common behavior after an individual's mental state stabilizes. Dr. Montgomery opined that due to heavy drug usage, some individuals could have symptoms of psychosis that last for weeks even after ceasing drug use. Dr. Montgomery heard Officer Gotsey's testimony that Defendant said, "those are not my parents" inside the house and that they were pedophiles. Dr. Montgomery found this statement to be

---

[2] The trial transcript references this test as the "SERS" or "SIRUS 2" test. However, the trial court referred to the test as the SIRS-2 in its written order denying Defendant's motion for new trial, and the parties refer to the test as the SIRS-2 in their briefs. For consistency, we will refer to the test as the SIRS-2.

significant in determining that Defendant "was having a fixed false belief that was not based in reality, was not true[.]"

In regard to Defendant's calm demeanor, Dr. Montgomery explained that someone who is convinced of what they are saying or doing under delusions "may be calm in thinking that they've done nothing -- nothing wrong." Dr. Montgomery believed Defendant "was suffering from a severe mental disease, a drug induced psychosis[]" at the time of the stabbing. Dr. Montgomery admitted Defendant also told him that his father had physically and verbally abused him.

In rebuttal, the State presented Dr. June Young, a clinical psychologist, as an expert in the field of psychology. Dr. Young interviewed Defendant for one hour on July 27, 2016. Dr. Young administered various mental tests to Defendant. During a "numbers" test where Dr. Young told Defendant to remember specific numbers, he could retain them very well. Dr. Young said that this led her to believe that "his concentration was better than he was trying to portray at that point." Dr. Young found that Defendant's actions during this test suggested "malingering memory[.]" Dr. Young testified that Defendant's statement about stabbing his parents in the back indicated that "he was aware he was stabbing somebody." Dr. Young testified that Defendant did not mention pedophilia during his interview with her.

Dr. Young stated that "the MFAS [administered by Dr. Montgomery] suggested that [Defendant] was clearly malingering." When asked about the results of the SIRS-2 test, she stated, "Well, it technically makes the test invalid. . . . But since on that test you have to have six in the honest category to be considered honest. It does raise an eyebrow. He only had two." On cross-examination, Dr. Young admitted that there was evidence Defendant was suffering from drug-induced auditory hallucinations and paranoia around the time of the stabbing. Dr. Young admitted that Defendant's blood test did not assess for amphetamines.

The State presented Dr. Edward Kovach and the trial court accepted him as an expert in the field of forensic psychology. Dr. Kovach met Defendant during Defendant's inpatient stay at Middle Tennessee Mental Health Institute from January 11 to January 31, 2018. When Defendant arrived, the institute's staff completed a psychiatric exam, diagnosed Defendant with anti-depressive symptoms and sleep problems, and formed a treatment plan.

Dr. Kovach reviewed Defendant's "records," the affidavit of complaint, Dr. Montgomery's evaluation, and Dr. Young's evaluation. Dr. Kovach testified, "[Defendant] was able to appreciate, you know, the nature or wrongfulness of his actions in relation to his alleged crimes." Dr. Kovach noted that the drug testing did not test for

amphetamines or steroid drugs. Dr. Kovach considered Defendant's relationship with his father and the subsequent physical and verbal abuse that he suffered. Dr. Kovach believed the statement Defendant made to his mother, "how does it feel to be stabbed in the back?" to be suggestive of Defendant's understanding that he attacked his parents.

Dr. Kovach called the SIRS-2 test the gold-standard for malingering determinations. Based on the positive MFAS test and the indeterminate SIRS-2 test "pointing in that direction [of malingering]," Dr. Kovach believed that the results "suggest[ed] that there [was] some exaggeration of psychopathology." Dr. Kovach gave Defendant the Personality Assessment Inventory test to assess his personality. Dr. Kovach found indications that Defendant "was attempting to portray himself in an overly negative or pathological manner in different areas." Dr. Kovach testified that while Defendant may have had auditory hallucinations, they were not the "command" hallucinations that "would have compromised his appreciation of the wrongfulness." Dr. Kovach admitted that Defendant's behavior on the day of the offense was "unusual." He explained that even though Defendant's behavior was unusual, he did not "necessarily think that it meant that [Defendant] did not know the wrongfulness [of his actions]." Dr. Kovach acknowledged that the defense witnesses' testimonies gave evidence that Defendant at least suffered intermittent psychotic symptoms leading up to June 26, 2016.

Joseph Tillman testified that he was incarcerated at the same time as Defendant in the McMinn County Jail. Mr. Tillman and Defendant spoke about their cases with one another. Mr. Tillman wrote a letter to TBI Special Agent Herron detailing his conversations with Defendant. Mr. Tillman recalled Defendant sharing that prior to the stabbing, he was "hearing things in the ceiling [and t]hat he thought the FBI was there [at his house]." Mr. Tillman explained Defendant said he had these experiences "from the drugs." Mr. Tillman testified Defendant told him that the stabbing resulted from "outrage. He had a lot of anger. [Mr. Tillman] guess[ed] from coming down from the drug use. And then he had a lot of anger about -- towards his father." Mr. Tillman said Defendant told him that his father would not lend him money to buy drugs. When asked whether Defendant acknowledged the stabbing, Mr. Tillman answered in the affirmative. Mr. Tillman said Defendant expressed regret about stabbing his mother.

Mr. Tillman testified that Defendant expressed to him that his (Defendant's) intended plan to receive a lesser conviction was "to play crazy" and "put up a front." Mr. Tillman stated his own reason for testifying for the prosecution and against Defendant was that he needed "to do the right thing."

On cross-examination, Mr. Tillman admitted to having committed an extensive list of crimes, including burglaries, robberies, shoplifting, and various drug convictions. Mr. Tillman admitted that the letter he wrote to Special Agent Herron left out that "Defendant

stabbed his dad because of the drug usage." Mr. Tillman also admitted that there was nothing about Defendant's rage or anger in the letter.

After a *Momon* hearing, Defendant did not testify.

At the close of all the proof, Defendant renewed his motion for judgment of acquittal, arguing that he clearly established his affirmative defense of insanity. The trial court reserved its decision because of the differing testimonies between the lay and expert witnesses and opted for the jury to decide whether there was clear and convincing proof of insanity. The jury returned a unanimous verdict of guilty on both counts, thereby rejecting the insanity defense. The trial judge, sitting as the thirteenth juror, affirmed the jury's verdict.

*Sentencing Hearing*

The trial court determined that Defendant was a Range I Offender for the Class A felony, second degree murder, and ordered a within-range sentence of 20 years at 100 percent. The trial court determined that Defendant was a Range I Offender for the Class C felony, aggravated assault, and ordered a within-range sentence of three years at 30 percent to be served on probation, consecutive to the second degree murder sentence.

Defendant filed a timely motion for new trial and an amended motion for new trial. The trial court denied Defendant's motion for new trial. Defendant appealed.

*Analysis*

I.     *Sufficiency of the Evidence*

Defendant argues the evidence is insufficient to support his convictions for second degree murder and aggravated assault. Specifically, he contends that his insanity defense was "not effectively countered and should have resulted in a Rule 29 acquittal." Defendant also argues that he did not have the requisite mens rea at the time of the offenses due to his diminished capacity and that the trial court should have granted his renewed motion for judgment of acquittal. The State responds that the evidence was sufficient to support Defendant's convictions and that the trial court properly denied the motions.

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of

review applied by this Court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn.1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn.1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn.2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this Court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id*.

*Motion for Judgment of Acquittal*

Defendant argues that the trial court should have granted his motion for judgment of acquittal at the close of the State's proof. The State responds that the trial court properly denied Defendant's motion.

The trial court "shall order the entry of judgment of acquittal of one or more offenses charged . . . after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Tenn. R. Crim. P. 29(b). "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). The trial court's "determination of a motion for a judgment of acquittal raises a question of law" and must only consider the legal sufficiency of the evidence. *Id.*; *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The evidence offered prior to the motion for judgment of acquittal showed Defendant stabbing his parents in front of his niece and saying, "how does it feel to be stabbed in the back?" Mrs. Elrod and Officer Gotsey

essentially believed Defendant did not know who he was attacking. However, Officer Harrison testified he had met Defendant on several prior occasions and never noticed signs of paranoid or delusional behavior. Chief Miller found Defendant calm and polite during his interview. The trial court, considering only the legal sufficiency of the evidence, properly denied Defendant's motion for judgment of acquittal.

*Insanity*

Defendant argues that no reasonable trier of fact could have failed to find Defendant insane at the time of the offense. The State responds that it presented ample evidence to rebut Defendant's defense and that the jury acted reasonably.

Tennessee Code Annotated section 39-11-501 provides:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
>
> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.
>
> (c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

T.C.A. § 39-11-501. "[A]ppellate courts in Tennessee should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." *State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002). This reasonableness standard of review is similar to the standard reviewing courts apply when assessing the sufficiency of the evidence. *Id.* This Court, in applying the reasonableness standard, "should consider all the evidence in the record in the light most favorable to the [S]tate in determining whether the jury appropriately rejected the insanity defense." *Id.* When the evidence is disputed, this Court "should rarely reverse a jury's rejection of the insanity defense under this deferential standard of review." *Id.* at 556.

In *Flake*, the Tennessee Supreme Court "explicitly reject[ed] the notion that the State must rebut defense proof of insanity with substantial evidence." *Flake*, 88 S.W.3d at 554. Nevertheless, "defense proof can be countered by contrary expert testimony, lay witnesses, or vigorous cross-examination designed to undermine the credibility of the defense expert." *Id.*

"In determining whether a defendant is insane, a jury is entitled to consider all the evidence offered, including the facts surrounding the crime, the testimony of lay witnesses, and expert testimony." *Id.* at 556. The jury must determine the weight and value given to expert testimony. *Id.* at 554 (citing *Edwards v. State*, 540 S.W.2d 641, 647 (Tenn. 1976)). It is not the role of this Court to reweigh the evidence or reevaluate the jury's credibility determinations. *Id.* (citing *State v. Holder*, 15 S.W.3d, 905, 912 (Tenn. Crim. App. 1999)). "Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case." *Id.* (citing *Edwards*, 540 S.W.2d at 647).

Defendant, in essence, asks this Court to reweigh the evidence and find against the jury's determination that Defendant was not insane at the time of the offense. The credibility of witnesses and the weight given to their testimonies are matters entrusted to the jury. *Edwards*, 540 S.W.2d at 647.

Dr. Young interviewed Defendant in July of 2016 and testified that she believed Defendant to be exaggerating his symptoms of mental illness. Dr. Young administered various mental tests and found that "[Defendant's] concentration was better than he was trying to portray at that point." Dr. Young found this suggestive of "malingering memory." Dr. Young said that Defendant's statement, "how does it feel to be stabbed in the back?" signified to her that Defendant "was aware he was stabbing somebody."

Dr. Montgomery interviewed Defendant in February of 2017. He testified that in his opinion, Defendant suffered from a drug-induced psychosis at the time of the offense. However, he administered two different mental evaluations and Defendant scored positive for exaggeration of mental illness on one and indeterminate for malingering on the other. Despite the test results, Dr. Montgomery explained that a history of persistent drug or alcohol abuse could lead to a drug-induced psychosis long after an individual has stopped using drugs or alcohol. Dr. Montgomery testified that Defendant "was having a fixed false belief that was not based in reality, was not true[.]"

Dr. Kovach examined Defendant over a 20-day period in January of 2018. He testified that he thought Defendant likely to be malingering. Dr. Kovach acknowledged

Defendant suffered some psychotic symptoms prior to June 26, 2016. However, he testified that they were not necessarily of the type which "would have compromised his appreciation of [] wrongfulness."

In regard to lay testimony, Mrs. Elrod testified that she did not believe Defendant knew who he was attacking. Officer Gotsey testified that when he arrived at the residence, Defendant said, "I stabbed the M.F.er's because they're pedophiles and they're hurting that little girl in there." Charity Elrod and Chadwick Simpson both testified Defendant exhibited various strange behaviors in the weeks leading up to the stabbing.

However, O.E. heard Defendant say, "how does it feel to be stabbed in the back?" Officer Harrison testified that he had met Defendant in the past and had never seen Defendant demonstrate paranoid or delusional behaviors. Police Chief Miller testified Defendant was calm during his interview and had no emotional reaction to news of his father's passing. Mr. Tillman testified that Defendant told him he planned to "play crazy" to receive a lesser sentence.

The jury rejected the insanity defense when it convicted Defendant of second degree murder and aggravated assault. Viewed in the light most favorable to the State, we conclude Defendant failed to prove insanity by clear and convincing evidence.

*Diminished Capacity*

Defendant contends that the evidence is insufficient to support his convictions because of his diminished capacity at the time of the offenses. The State responds that the jury reasonably rejected Defendant's diminished capacity defense.

Second degree murder is a knowing killing of another. T.C.A. § 39-13-210(a)(1). As relevant, "[a] person commits aggravated assault who intentionally or knowingly commits an assault as defined in § 39-13-101 and the assault . . . involved the use or display of a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(A)(iii). A person acts "knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-13-302(b).

Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate elements of specific intent. *State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). In *Hall*, our supreme court explained:

> [D]iminished capacity is not considered a justification or excuse for a
> crime, but rather an attempt to prove that the defendant, incapable of the

requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. In other words, "diminished capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state.

958 S.W.2d at 688 (citations omitted). The testimony from the expert "should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." *Id.* at 690.

The State presented proof that after Defendant stabbed his parents, he told his mother, "how does it feel to be stabbed in the back?" Mr. Tillman testified that Defendant told him he planned to "play crazy" for a lesser sentence. Dr. Young testified that Defendant's behavior during his interview suggested a "malingering memory." Dr. Kovach testified that in his opinion, Defendant was likely exaggerating his symptoms of mental illness and was able to appreciate the wrongfulness of his actions. While Dr. Montgomery testified Defendant suffered a drug-induced psychosis, the jury accredited the State's experts and rejected Defendant's diminished capacity defense. We conclude that the evidence, while not overwhelming, was sufficient for a jury to reasonably conclude that Defendant acted with a knowing intent.

### *Renewed Motion for Judgment of Acquittal*

Defendant contends that the trial court should have granted his renewed motion for judgment acquittal at the close of all the proof. The State responds that the trial court properly denied Defendant's motion when it affirmed the jury's verdict.

The trial court, considering all of the evidence, reserved its decision on the renewed motion until after the jury returned its verdict. In light of the prior analysis on the initial motion for judgment of acquittal, the insanity defense, and the diminished capacity defense, we determine that the trial court properly denied Defendant's renewed motion when it affirmed the verdict of the jury.

### *II.* *Sentencing*

### *Within-range Sentence*

Defendant argues that the trial court abused its discretion in imposing above-minimum sentences and in ordering consecutive sentencing. The State contends that the trial court did not abuse its discretion. We agree with the State.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)).

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. § 40-35-102, -103, -210(b); *see also Bise*, 380 S.W.3d at 697-98. Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

The trial court relied on enhancement factors (1), (8), and (10) in fashioning Defendant's sentences. *See* T.C.A. § 40-35-114(1), (8), and (10). The trial court found enhancement factor (1) applied, that the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range, based on Defendant's six prior convictions. *See id.* § 40-35-114(1). The trial court applied enhancement factor (8), that the defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community, because Defendant was on probation for a prior marijuana conviction when he drove on a revoked license. *See id.* § 40-35-114(8). The trial court applied enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high, because Defendant stabbed his father, mother, and sought out his niece. *See id.* § 40-35-114(10). The court noted that "by [Defendant's] rendition of the fact it was to save the child from the actions of his parents."

For Count 2, the trial court also relied on enhancement factors (6) and (12). *See id.* §§ 40-35-114(6) and (12). The trial court applied enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great, because Defendant stabbed Mrs. Elrod. *See id.* § 40-35-114(6). The court explained that based on how the aggravated assault was charged, Mrs. Elrod's injury was not an element of the offense. The trial court found enhancement factor (12), that during the commission of the felony, the defendant intentionally inflicted serious bodily injury upon another person, applied for the same reason the court applied enhancement factor (6). *See id.* § 40-35-114(12).

The trial court found mitigating factor (10), that Defendant assisted the authorities in uncovering offenses committed by other persons, applicable because Defendant stayed at the scene and revealed the location of the knife to the responding officers. *See* T.C.A. § 40-35-113(10). The trial court also found Defendant's mental illness to be a mitigating factor under mitigating factor (13). *See id.* § 40-35-113(13).

Defendant contests the trial court's application of enhancement factor (10). We conclude the trial court properly applied enhancement factor (10) because the facts indicate Defendant continued to attack his father when Mrs. Elrod and O.E. entered the kitchen. The trial court considered the relevant sentencing principles, imposed within-range sentences, and is therefore entitled to a presumption of correctness. *Bise*, 380 S.W.3d at 709-10. We conclude that the trial court did not abuse its discretion in sentencing Defendant to within range sentences of 20 years in Count 1. The three year sentence imposed in Count 2 is the minimum for a class C felony, and thus not logically subject to a within-range complaint.

### *Consecutive Sentencing*

If a trial court finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in Tennessee Code Annotated section 40-35-115(b), it may order multiple offenses to be served consecutively. T.C.A. § 40-35-115(b). This Court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1); *see State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2); *see Imfeld*, 70 S.W.3d at 708. If a trial court finds by a preponderance of the evidence that even one factor from Tennessee Code Annotated section 40-35-115(b) applies, the trial court may order sentences to run consecutively. T.C.A. § 40-35-115(b).

Here, the trial court ordered consecutive sentencing based on Tennessee Code Annotated section 40-35-115(b)(4), that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. *See* T.C.A. § 40-35-115(b)(4). When imposing consecutive sentences based on the dangerous offender classification, Tennessee Code Annotated section 40-35-115(b)(4), the trial court must conclude that the proof establishes that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." *Id.* (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)).

At the conclusion of the sentencing hearing, the trial court recited the *Wilkerson* factors and found them both met. The trial court found that the "circumstances surrounding the [stabbing] were aggravated." The trial court did not specifically state what evidence supported the *Wilkerson* factors. However, in applying enhancement factor (10), the trial court found Defendant acted without hesitation when the risk to human life was high because Defendant stabbed his father, mother, and "chased after the little girl[.]" The trial court noted the risk of harm to Mrs. Elrod and O.E., who were in the vicinity of Defendant when he stabbed his father. The trial court stated that an extended period of confinement was necessary to protect society because "Defendant ha[d] chosen an antisocietal lifestyle[]" and that the length of sentences reasonably related to his offenses.

The trial court did not abuse its discretion in imposing consecutive sentencing. Defendant is not entitled to relief on this issue.

*Conclusion*

Based on the foregoing, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE